585 So.2d 293 (1991)
UNIVERSITY OF MIAMI, D/B/a the University of Miami School of Medicine, a Florida Corporation, Appellant,
v.
Patricia ECHARTE, a Minor, by and through Her Parents and Natural Guardians, Norma Echarte and Pedro Echarte, and Norma Echarte and Pedro Echarte, Individually, Appellees.
No. 90-982.
District Court of Appeal of Florida, Third District.
June 11, 1991.
Fowler, White, Burnett, Hurley, Banick & Strickroot and Steven E. Stark and Michael L. Friedman, Miami, for appellant.
Grossman & Roth, Podhurst, Orseck, Josefsberg, Eaton, Meadow, Olin & Perwin and Joel Eaton and Joel Perwin, Miami, for appellees.
Blackwell & Walker and James E. Tribble, Miami, for Florida Defense Lawyers Ass'n, as amici curiae.
*294 Stephens, Lynn, Klein & McNicholas, Robert M. Klein and Debra J. Snow, Miami, for Florida Hosp. Ass'n and Florida Medical Ass'n, as amici curiae.
Robert A. Butterworth, Atty. Gen. and Louis F. Hubener, Asst. Atty. Gen., for the State, as amici curiae.
Before NESBITT, BASKIN and JORGENSON, JJ.
BASKIN, Judge.
The University of Miami[1] [University] appeals a final summary judgment declaring sections 766.207[2] and *295 766.209,[3] Florida Statutes (Supp. 1988), unconstitutional. We affirm, and in so doing, hold that sections 766.207 and 766.209 fail the test enunciated in Kluger v. White, 281 So.2d 1 (Fla. 1973), and violate claimant's right of access to the courts.
The University treated Patricia Echarte, a minor, for a brain tumor. As a result of the University's allegedly negligent acts, Patricia's right hand and forearm had to be amputated to save her life. Pursuant to section 766.106, Florida Statutes (Supp. 1988), Patricia and her parents delivered to the University a notice of intent to initiate malpractice litigation. The University served the Echartes with a request for voluntary binding arbitration of damages. § 766.207(2), Fla. Stat. (Supp. 1988). In response, the Echartes filed an action for declaratory judgment to determine the constitutionality *296 of sections 766.207 and 766.209. They argued that those statutes violate the Florida and United States Constitutions. Agreeing with their contentions, the trial court entered summary judgment in their favor. The court ruled that the cited statutes violate the Echartes' constitutional rights of access to the court,[4] rights to trial by jury,[5] equal protection guarantees,[6] and procedural and substantive due process rights.[7] In addition, the trial court decided that the statutes violate the single subject requirement of the Florida Constitution,[8] and constitute a taking without compensation,[9] as well as an improper delegation of authority.[10] We affirm the trial court's determination that the statutes deny claimants the right of access to court. We expressly decline to consider the other asserted grounds.
The statutory scheme at issue was enacted in accordance with the recommendations of a study by the Academic Task Force for Review of Insurance and Tort Systems[11] concerning Florida's medical malpractice crisis. The legislature announced the purpose of the legislation in the preamble to chapter 88-1 (amended and reenacted Ch. 88-277, Laws of Florida)[12] and in section 766.201, Florida Statutes (Supp. 1988).[13] *297 The legislature found, inter alia, that the excessive and injurious cost of medical liability insurance premiums had caused a crisis in Florida's medical liability insurance industry endangering a potential defendant's ability to purchase malpractice insurance and a potential claimant's ability to collect damages for losses. Accordingly, the legislature found that a voluntary binding arbitration plan that included damage limitations would alleviate the crisis.
The trial court held unconstitutional statutes limiting recovery of damages for a claimant's loss of income and loss of earning capacity, and capping a claimant's non-economic damages[14] in medical malpractice actions when a defendant concedes liability and requests arbitration. Specifically, section 766.207(2) provides for voluntary binding arbitration of medical negligence claims upon election of either party following "completion of presuit investigation with preliminary reasonable grounds for a medical malpractice claim intact... ." § 766.207(2), Fla. Stat. (Supp. 1988). The remainder of section 766.207 sets forth the procedures and consequences pertaining to the arbitration of claims. Section 766.207(7) delineates the damages claimant is entitled to recover in the arbitration, capping claimant's noneconomic damages at $250,000.[15] Section 766.209 states the consequences of failure to request arbitration, as well as the effect of defendant's or claimant's refusal to accept an offer of binding arbitration. If a claimant rejects arbitration, the matter proceeds to trial and claimant's noneconomic damages are capped at $350,000. § 766.209(4), Fla. Stat. (Supp. 1988). Upon defendant's rejection of claimant's offer to arbitrate, the trial proceeds "without limitation on damages, and the claimant, upon proving medical negligence, shall be entitled to recover prejudgment interest and reasonable attorney's fees up to 25 percent of the award reduced to present value." § 766.209(3)(a), Fla. Stat. (Supp. 1988).
We need not consider all the asserted arguments because we hold that sections 766.207 and 766.209 offend article I, section 21, of the Florida Constitution. Kluger v. White, 281 So.2d 1, 3 (Fla. 1973). Article 1, section 21 provides that "[t]he courts shall be open to every person for redress of any injury, and justice shall be administered without sale, denial or delay." The statutes *298 in question violate that principle. The final judgment states, in relevant part:
The Court has jurisdiction pursuant to § 86.011, Fla. Stat. (1987).
As applied to the facts in this case, the challenged statutes give the admittedly negligent defendant the unilateral right to "cap" the plaintiffs' damage recovery at an amount which is significantly lower than the actual damages which its negligence caused. The statutes provide no reasonable alternative remedy or commensurate benefit to the plaintiffs. The legislature has also failed to demonstrate that this draconian restriction upon the plaintiffs' constitutional right of access to the courts is required by an overpowering public necessity and that no reasonable alternative exists. The challenged statutes therefore violate Article I, § 21 of the Florida Constitution. Smith v. Department of Insurance, 507 So.2d 1080 (Fla. 1987).
In Smith v. Department of Ins., 507 So.2d 1080 (Fla. 1987), the court held that the test set forth in Kluger must be applied to determine whether a statutory scheme restricting noneconomic damages violates article 1, section 21. The Smith court held that such a restriction is not permissible "unless one of the Kluger exceptions is met: i.e., (1) providing a reasonable alternative remedy or commensurate benefit, or (2) legislative showing of overpowering public necessity for the abolishment of the right and no alternative method of meeting such public necessity." Smith, 507 So.2d at 1088. Applying that test, the Smith court concluded that an absolute $450,000 cap on noneconomic damages in personal injury cases did not meet the first exception and held that it violated claimant's constitutional right of access to the courts.[16]
Addressing the first prong of the Kluger test, we hold that the statute before us, examined under the Smith and Kluger standards, violates article I, section 21 by failing to provide "a reasonable alternative to protect the rights of [medical malpractice victims] to redress for injuries... ." Kluger, 281 So.2d at 4. We disagree with the University's contention that the arbitration procedure provided in the statutory scheme constitutes a reasonable alternative remedy or commensurate benefit to claimants and thereby renders Smith inapplicable.[17]
In support of its argument, the University cites cases upholding the Workers' Compensation Law,[18] and Florida's No-Fault Automobile Insurance Act,[19] against right of access challenges. The Florida Supreme Court held the statutory schemes of those laws constitutional because they employ compulsory insurance coverage no-fault concepts that assure prompt recovery of certain losses. See Martinez v. Scanlan, 582 So.2d 1167 (Fla. 1991); De Ayala v. Florida Farm Bureau Cas. Ins. Co., 543 So.2d 204 (Fla. 1989); Smith; Lasky v. State Farm Ins. Co., 296 So.2d 9 (Fla. 1974). The no-fault automobile statutes provide a reasonable alternative to tort litigation: vehicle owners are required to purchase insurance to assure injured persons prompt recovery of major economic losses. Chapman v. Dillon, 415 So.2d 12 (Fla. 1982); Lasky; cf. Kluger, 281 So.2d at 5. Moreover, a claimant may recover some *299 damages despite fault below a certain threshold and enjoys "immunity from being held liable for the pain and suffering of the other parties to the accident... ." Lasky, 296 So.2d at 14. The failure to maintain insurance negates an owner's tort immunity. Chapman; Lasky.
For similar reasons, the supreme court also upheld workers' compensation statutes: those statutes "afford substantial advantages to injured workers, ... without their having to endure the delay and uncertainty of tort litigation." Acton v. Fort Lauderdale Hosp., 440 So.2d 1282, 1284 (Fla. 1983); Martinez, 582 So.2d at 1172; Sasso v. Ram Property Management, 452 So.2d 932 (Fla.), appeal dismissed, 469 U.S. 1030, 105 S.Ct. 498, 87 L.Ed.2d 391 (1984); Mahoney v. Sears, Roebuck & Co., 440 So.2d 1285 (Fla. 1983). Those advantages include prompt recovery of medical expenses and lost wages without having to prove fault. Furthermore, "[t]he justification for limiting liability or granting immunity is the substitution of something else in its place, a quid pro quo. The duty to provide workers' compensation benefits supplants tort liability to those injured on the job." Employers Ins. of Wausau v. Abernathy, 442 So.2d 953, 954 (Fla. 1983).
Those benefits do not obtain under the statutes in issue. Here, a defendant retains causation defenses and the claimant must demonstrate reasonable grounds to initiate medical negligence litigation, § 766.203(2), Fla. Stat. (Supp. 1988), through an extensive presuit investigation procedure.[20] § 766.106,.203-.206, Fla. Stat. (Supp. 1988); see Fla.R.Civ.P. 1.650. Thus, although defendant agrees to pay certain damages following presuit screening, the statute does not provide a no-fault basis for recovery. Additionally, because insurance coverage is not mandated, defendant's immunity from liability for noneconomic damages in excess of the cap is not dependent on insurance coverage and claimant is not assured recovery of its allowable losses. The statutory scheme does provide certain benefits to claimants. These benefits may include the right to demand arbitration, § 766.207(2), reasonable attorney's fees and costs, § 766.207(7)(b), interest on all accrued damages, § 766.207(7)(e), arbitration costs and fees, § 766.207(7)(g). In addition, defendants are held jointly and severally liable for damages awarded to claimant. § 766.207(7)(h). We hold, however, that those benefits are not commensurate with claimant's loss of noneconomic damages in excess of the damage cap.
Furthermore, unlike the workers' compensation statutes and the no-fault automobile insurance statutes, the benefits in the statutes under review are not balanced between claimant and defendant. The true benefit  the damage cap  inures only to the negligent defendant: "a medical patient ... obtains no compensatory benefit from a cap placed on noneconomic damages because of the unlikeliness of negligence by a patient... ." Smith, 507 So.2d at 1088 (footnote omitted). Compare Martinez, 582 So.2d at 1171-72; De Ayala, 543 So.2d at 206; Smith, 507 So.2d at 1088; University of Miami v. Matthews, 97 So.2d 111, 114 (Fla. 1957); Grice v. Suwanee Lumber Mfg. Co., 113 So.2d 742, 745-6 (Fla. 1st DCA 1959).
Finally, the University contends that the statutes provide benefits to all medical malpractice claimants and potential claimants. However, a benefit to society in general does not satisfy Kluger. The benefits must inure to the medical malpractice victim. Smith. Although the legislature found that the $350,000 cap "represents an appropriate balance between the interests of all patients ... and the interests of those patients who are injured as a result of medical negligence," § 766.209(4)(a), Fla. Stat. (Supp. 1988), the Florida Supreme Court has held that such an analysis is relevant only if the statute meets the Kluger test. Smith, 507 So.2d at 1089. Accordingly, a balancing of interests does not support the University's contention that the arbitration procedure is a benefit to claimant. For these reasons, we conclude that the arbitration procedure does not provide *300 a reasonable alternative remedy or commensurate benefit permitting the legislature to restrict claimant's noneconomic damages.
For the reasons we next discuss, we also hold that the statutory scheme does not meet the second Kluger exception  a legislative showing of "an overpowering public necessity for the abolishment of such right, and no alternative method of meeting such public necessity can be shown." Kluger, 281 So.2d at 4.
In Overland Constr. Co., Inc. v. Sirmons, 369 So.2d 572, 574 (Fla. 1979), the court stated: "[t]he ... issue ... is whether the legislature has shown an overpowering public necessity for this prohibitory provision, and an absence of less onerous alternatives." (emphasis supplied). The legislative finding that a crisis exists in the medical liability insurance industry is not sufficient to satisfy the requirements of Kluger and Overland. The findings must demonstrate an overpowering public necessity to cap noneconomic damages of the most seriously injured victims. However, a careful review of the legislative findings does not demonstrate the requisite overpowering public necessity for restricting damages.
In Carr v. Broward County, 541 So.2d 92 (Fla. 1989), the supreme court held that a statute of repose in medical malpractice actions does not violate plaintiffs' right of access to the courts. The court held that the legislature demonstrated an overpowering public necessity where the legislature found that absent a statute of repose "doctors will be forced to curtail their practices, retire, or practice defensive medicine at increased costs to the citizens of Florida[.]" Carr, 541 So.2d at 94 (quoting preamble to chapter 75-9, Laws of Florida, Medical Malpractice Reform Act of 1975). Carr is distinguishable from the case before us. In Carr, the statute merely shortened the time during which claimants could recover the full amount of damages. The Florida Supreme Court has consistently "recognized that statutes of repose are a valid legislative means to restrict or limit causes of action in order to achieve certain public interests." Carr, 541 So.2d at 95; Blizzard v. W.H. Roof Co., Inc., 573 So.2d 334 (Fla. 1991). Here, however, the statute eliminates all recovery in excess of the cap. The supreme court has not recognized the necessity of limiting noneconomic damages absent an alternative remedy or a commensurate benefit.[21]See generally, Smith; Florida Patient's Compensation Fund v. Von Stetina, 474 So.2d 783, 789 (Fla. 1985). Moreover, the functional unavailability of insurance for some physicians[22] does not *301 rise to the level of a danger of inability to obtain medical care. Carr; Carter v. Sparkman, 335 So.2d 802, 805 (Fla. 1976) ("At the time of enactment ... there was an imminent danger that a drastic curtailment in the availability of health care services would occur in this state."), cert. denied, 429 U.S. 1041, 97 S.Ct. 740, 50 L.Ed.2d 753 (1977), receded from Aldana v. Holub, 381 So.2d 231 (Fla. 1980). Finally, it is unclear how effective a damage cap would be in alleviating the cost of loss payments, paid claims, and liability insurance premiums. The legislature found that caps provide an incentive for defendants to admit liability and to arbitrate damages thereby decreasing such costs.[23] Although the Task Force found that the "high-end awards are a substantial cause of the increase in paid losses," Medical Malpractice Recommendations, at 26; see § 766.201(1)(b), it failed to differentiate between economic and noneconomic damage awards. Its findings concerning prospective reduction of approximately 2.4% to 11% in loss payments are based on "hypothetical assumptions (rather than empirical data) as to the distribution of economic and non-economic losses in past paid claim data." Final Recommendations at 62. The Task Force warned that the "figures are offered only for what they say about relative magnitude [of savings from a cap on medical claims to savings from a cap on other liability claims]. They should not be misinterpreted as vouching for the amount of savings that might be realized from caps on non-economic damages." Final Recommendations at 63. Such assumptions provide an uncertain predicate for imposing a cap on noneconomic damages. The legislature has not demonstrated the requisite overpowering public necessity for restricting claimant's noneconomic damages.
The legislature must also show that no less onerous alternative method exists for meeting such necessity. Smith; Overland; Kluger. The legislature did not expressly find that no alternative method existed; however, the Task Force considered several alternatives[24] and stated that "[o]f these alternatives, only a cap on non-economic damages would reduce malpractice claims appreciably... ." Medical Malpractice Reform Alternatives, October 2, 1987 at 5. That qualified finding does not satisfy the Kluger test. See Ch. 90-401, preamble, 1990 Laws of Florida ("[T]he legislature finds that the reforms contained in this act are the only alternative available that will meet the public necessity of maintaining a workers' compensation system... .") (emphasis supplied); see also Overland, 369 So.2d at 573. We decline to infer the requisite showing from the passage of the legislation. Such an inference would render illusory this part of the Kluger test. The Smith court stated that "if it were permissible to restrict the constitutional right by legislative action, without meeting the conditions set forth in Kluger, the constitutional right of access to the courts for redress of injuries would be subordinated to, and a creature of, legislative grace or, ... `majoritarian whim'. [O]urs is not such a system." Smith, 507 So.2d at 1089 (emphasis supplied). Accordingly, we hold that the legislative findings do not satisfy this prong of the Kluger test.
In conclusion, we affirm the final summary judgment and hold that sections 766.207 and 766.209 violate article I, section 21, of the Florida Constitution.
Affirmed.
NOTES
[1] The University of Miami d/b/a The University of Miami School of Medicine, a Florida corporation.
[2] Section 766.207, Florida Statutes (Supp. 1988), provides:

Voluntary binding arbitration of medical negligence claims. 
(1) Voluntary binding arbitration pursuant to this section and ss. 766.208-766.212 shall not apply to rights of action involving the state or its agencies or subdivisions, or the officers, employees, or agents thereof, pursuant to s. 768.28.
(2) Upon the completion of presuit investigation with preliminary reasonable grounds for a medical negligence claim intact, the parties may elect to have damages determined by an arbitration panel. Such election may be initiated by either party by serving a request for voluntary binding arbitration of damages within 90 days after service of the claimant's notice of intent to initiate litigation upon the defendant. The evidentiary standards for voluntary binding arbitration of medical negligence claims shall be as provided in s. 120.58(1)(a).
(3) Upon receipt of a party's request for such arbitration, the opposing party may accept the offer of voluntary binding arbitration within 30 days. However, in no event shall the defendant be required to respond to the request for arbitration sooner than 90 days after service of the notice of intent to initiate litigation under s. 766.106. Such acceptance within the time period provided by this subsection shall be a binding commitment to comply with the decision of the arbitration panel. The liability of any insurer shall be subject to any applicable insurance policy limits.
(4) The arbitration panel shall be composed of three arbitrators, one selected by the claimant, one selected by the defendant, and one an administrative hearing officer furnished by the Division of Administrative Hearings who shall serve as the chief arbitrator. In the event of multiple plaintiffs or multiple defendants, the arbitrator selected by the side with multiple parties shall be the choice of those parties. If the multiple parties cannot reach agreement as to their arbitrator, each of the multiple parties shall submit a nominee, and the director of the Division of Administrative Hearings shall appoint the arbitrator from among such nominees.
(5) The arbitrators shall be independent of all parties, witnesses, and legal counsel, and no officer, director, affiliate, subsidiary, or employee of a party, witness, or legal counsel may serve as an arbitrator in the proceeding.
(6) The rate of compensation for medical negligence claims arbitrators other than the administrative hearing officer shall be set by the chief judge of the appropriate circuit court by schedule providing for compensation of not less than $250 per day nor more than $750 per day or as agreed by the parties. In setting the schedule, the chief judge shall consider the prevailing rates charged for the delivery of professional services in the community.
(7) Arbitration pursuant to this section shall preclude recourse to any other remedy by the claimant against any participating defendant, and shall be undertaken with the understanding that:
(a) Net economic damages shall be awardable, including, but not limited to, past and future medical expenses and 80 percent of wage loss and loss of earning capacity, offset by any collateral source payments.
(b) Noneconomic damages shall be limited to a maximum of $250,000 per incident, and shall be calculated on a percentage basis with respect to capacity to enjoy life, so that a finding that the claimant's injuries resulted in a 50-percent reduction in his capacity to enjoy life would warrant an award of not more than $125,000 noneconomic damages.
(c) Damages for future economic losses shall be awarded to be paid by periodic payments pursuant to s. 766.202(8) and shall be offset by future collateral source payments.
(d) Punitive damages shall not be awarded.
(e) The defendant shall be responsible for the payment of interest on all accrued damages with respect to which interest would be awarded at trial.
(f) The defendant shall pay the claimant's reasonable attorney's fees and costs, as determined by the arbitration panel, but in no event more than 15 percent of the award, reduced to present value.
(g) The defendant shall pay all the costs of the arbitration proceeding and the fees of all the arbitrators other than the administrative hearing officer.
(h) Each defendant who submits to arbitration under this section shall be jointly and severally liable for all damages assessed pursuant to this section.
(i) The defendant's obligation to pay the claimant's damages shall be for the purpose of arbitration under this section only. A defendant's or claimant's offer to arbitrate shall not be used in evidence or in argument during any subsequent litigation of the claim following the rejection thereof.
(j) The fact of making or accepting an offer to arbitrate shall not be admissible as evidence of liability in any collateral or subsequent proceeding on the claim.
(k) Any offer by a claimant to arbitrate must be made to each defendant against whom the claimant has made a claim. Any offer by a defendant to arbitrate must be made to each claimant who has joined in the notice of intent to initiate litigation, as provided in s. 766.106. A defendant who rejects a claimant's offer to arbitrate shall be subject to the provisions of s. 766.209(3). A claimant who rejects a defendant's offer to arbitrate shall be subject to the provisions of s. 766.209(4).
(l) The hearing shall be conducted by all of the arbitrators, but a majority may determine any question of fact and render a final decision.
The chief arbitrator shall decide all evidentiary matters.
The provisions of this subsection shall not preclude settlement at any time by mutual agreement of the parties.
(8) Any issue between the defendant and the defendant's insurer or self-insurer as to who shall control the defense of the claim and any responsibility for payment of an arbitration award, shall be determined under existing principles of law; provided that the insurer or self-insurer shall not offer to arbitrate or accept a claimant's offer to arbitrate without the written consent of the defendant.
(9) The Division of Administrative Hearings is authorized to promulgate rules to effect the orderly and efficient processing of the arbitration procedures of ss. 766.201-766.212.
(10) Rules promulgated by the Division of Administrative Hearings pursuant to this section, s. 120.53, or s. 120.65 may authorize any reasonable sanctions except contempt for violation of the rules of the division or failure to comply with a reasonable order issued by a hearing officer, which is not under judicial review. (Notes omitted).
[3] Section 766.209, Florida Statutes (Supp. 1988), provides:

Effects of failure to offer or accept voluntary binding arbitration. 
(1) A proceeding for voluntary binding arbitration is an alternative to jury trial and shall not supersede the right of any party to a jury trial.
(2) If neither party requests or agrees to voluntary binding arbitration, the claim shall proceed to trial or to any available legal alternative such as offer of and demand for judgment under s. 768.79 or offer of settlement under s. 45.061.
(3) If the defendant refuses a claimant's offer of voluntary binding arbitration:
(a) The claim shall proceed to trial without limitation on damages, and the claimant, upon proving medical negligence, shall be entitled to recover prejudgment interest, and reasonable attorney's fees up to 25 percent of the award reduced to present value.
(b) The claimant's award at trial shall be reduced by any damages recovered by the claimant from arbitrating codefendants following arbitration.
(4) If the claimant rejects a defendant's offer to enter voluntary binding arbitration:
(a) The damages awardable at trial shall be limited to net economic damages, plus noneconomic damages not to exceed $350,000 per incident. The Legislature expressly finds that such conditional limit on noneconomic damages is warranted by the claimant's refusal to accept arbitration, and represents an appropriate balance between the interests of all patients who ultimately pay for medical negligence losses and the interests of those patients who are injured as a result of medical negligence.
(b) Net economic damages reduced to present value shall be awardable, including, but not limited to, past and future medical expenses and 80 percent of wage loss and loss of earning capacity, offset by any collateral source payments.
(c) Damages for future economic losses shall be awarded to be paid by periodic payments pursuant to s. 766.202(8), and shall be offset by future collateral source payments.
(5) Jury trial shall proceed in accordance with existing principles of law.
[4] Art. I, § 21, Fla. Const.
[5] Art. I, § 22, Fla. Const.
[6] Art. I, § 2, Fla. Const.; U.S. Const. amend. XIV, § 1.
[7] Art. I, § 9, Fla. Const.; U.S. Const. amend XIV, § 1.
[8] Art. III, § 6, Fla. Const.
[9] Art. X, § 6(a), Fla. Const.
[10] Art. II, § 3, Fla. Const.
[11] The legislature established the Academic Task Force pursuant to the Tort and Insurance Reform Act of 1986. Chap. 86-160, Laws of Florida. The legislature based its findings on the Academic Task Force reports. Ch. 88-1, Laws of Fla. (amended and reenacted ch. 88-277, Laws of Fla.). The reports consist of the Academic Task Force's Preliminary Fact-Finding Report on Medical Malpractice, August 14, 1987; Medical Malpractice Reform Alternatives, October 2, 1987; Medical Malpractice Recommendations, November 6, 1987; and Final Recommendations, March 1, 1988.
[12] The preamble provides:

WHEREAS, the Legislature finds that there is in Florida a financial crisis in the medical liability insurance industry, and
WHEREAS, it is the sense of the Legislature that if the present crisis is not abated, many persons who are subject to civil actions will be unable to purchase liability insurance, and many injured persons will therefore be unable to recover damages for either their economic losses or their noneconomic losses, and
WHEREAS, the people of Florida are concerned with the increased cost of litigation and the need for a review of the tort and insurance laws, and
WHEREAS, the Legislature believes that, in general, the cost of medical liability insurance is excessive and injurious to the people of Florida and must be reduced, and
WHEREAS, the Legislature finds that there are certain elements of damage presently recoverable that have no monetary value, except on a purely arbitrary basis, while other elements of damage are either easily measured on a monetary basis or reflect ultimate monetary loss, and
WHEREAS, the legislature desires to provide a rational basis for determining damages for noneconomic losses which may be awarded in certain civil actions, recognizing that such noneconomic losses should be fairly compensated and that the interests of the injured party should be balanced against the interests of society as a whole, in that the burden of compensating for such losses is ultimately borne by all persons, rather than by the tortfeasor alone, and
WHEREAS, the legislature created the Academic Task Force for Review of the Insurance and Tort Systems which has studied the medical malpractice problems currently existing in the State of Florida, and
WHEREAS, the Legislature has reviewed the findings and recommendations of the Academic Task Force relating to medical malpractice, and
WHEREAS, the Legislature finds that the Academic Task Force has established that a medical malpractice crisis exists in the State of Florida which can be alleviated by the adoption of comprehensive legislatively enacted reforms, and
WHEREAS, the magnitude of this compelling social problem demands immediate and dramatic legislative action... .
[13] Section 766.201, Florida Statutes (Supp. 1988) provides, in pertinent part:

(1) The Legislature makes the following findings:
(a) Medical malpractice liability insurance premiums have increased dramatically in recent years, resulting in increased medical care costs for most patients and functional unavailability of malpractice insurance for some physicians.
(b) The primary cause of increased medical malpractice liability insurance premiums has been the substantial increase in loss payments to claimants caused by tremendous increases in the amounts of paid claims.
(c) The average cost of defending a medical malpractice claim has escalated in the past decade to the point where it has become imperative to control such cost in the interests of the public need for quality medical services.
(d) The high cost of medical malpractice claims in the state can be substantially alleviated by requiring early determination of the merit of claims, by providing for early arbitration of claims, thereby reducing delay and attorney's fees, and by imposing reasonable limitations on damages, while preserving the right of either party to have its case heard by a jury.
.....
(2) It is the intent of the Legislature to provide a plan for prompt resolution of medical negligence claims. Such plan shall consist of two separate components, presuit investigation and arbitration. .. .
.....
(b) Arbitration shall provide:
1. Substantial incentives for both claimants and defendants to submit their cases to binding arbitration, thus reducing attorney's fees, litigation costs, and delay.
2. A conditional limitation on noneconomic damages where the defendant concedes willingness to pay economic damages and reasonable attorney's fees.
3. Limitations on the noneconomic damages components of large awards to provide increased predictability of outcome of the claims resolution process for insurer anticipated losses planning, and to facilitate early resolution of medical negligence claims.
[14] Section 766.202(7), Florida Statutes (Supp. 1988), defines noneconomic damages as "nonfinancial losses which would not have occurred but for the injury giving rise to the cause of action, including pain and suffering, inconvenience, physical impairment, mental anguish, disfigurement, loss of capacity for enjoyment of life, and other nonfinancial losses."
[15] That award is "calculated on a percentage basis with respect to capacity to enjoy life, so that a finding that the claimant's injuries resulted in a 50-percent reduction in his capacity to enjoy life would warrant an award of not more than $125,000 noneconomic damages." § 766.207(7)(b), Fla. Stat. (Supp. 1988).
[16] The Smith court did not consider whether the statute met the second prong of the Kluger test.
[17] At the outset, we reject the University's contention that the contingency factor  permitting defendant unilaterally to cap claimant's damages  distinguishes the absolute cap from the cap at issue. That is a distinction without a difference. Where, as here, defendant decides not to contest liability and determines that claimant's noneconomic damages will surely exceed $250,000, it is virtually certain that defendants will request arbitration. Moreover, we question whether allowing a defendant to cap claimant's noneconomic damages is permissible. Cf. Martinello v. B & P USA, Inc., 566 So.2d 761 (Fla. 1990) (defendant not entitled to choose theory under which case is tried).
[18] Sasso v. RAM Property Management, 452 So.2d 932 (Fla. 1984); Mahoney v. Sears, Roebuck & Co., 440 So.2d 1285 (Fla. 1983); Acton v. Fort Lauderdale Hospital, 440 So.2d 1282 (Fla. 1983).
[19] Chapman v. Dillon, 415 So.2d 12 (Fla. 1982); Lasky v. State Farm Ins. Co., 296 So.2d 9 (Fla. 1974).
[20] Claimant is subject to sanctions upon the court's determination that the claim does not rest on a reasonable basis. § 766.206, Fla. Stat. (Supp. 1988).
[21] Indeed, "the Task Force recommended `rejection of a plan that would limit recovery of non-economic damages to $100,000 in all tort cases, including claims for medical negligence.' Two reasons were given for the negative recommendation: first, that `cost savings from this proposal would be achieved solely by penalizing the most seriously injured victims,' and second, that `the $100,000 cap is too low ... and removes recovery for legitimate damages in many cases without providing offsetting benefits for plaintiffs.'" Final Recommendations at 59 (quoting Medical Malpractice Recommendations at 35). However, the Task Force recommended a conditional limitation on noneconomic damages at a higher figure and as part of a plan to provide incentives for arbitration. Medical Malpractice Recommendations at 35.
[22] The Academic Task Force found that "[w]hile representing an expensive, but affordable `cost of doing business' item for many physicians, for some, liability coverage may be so costly as to be `functionally unavailable.' (e.g., young practitioners in high risk specialities serving in less affluent medically underserved regions)." Preliminary Fact-Finding Report on Medical Malpractice, April 14, 1987 at 239-240 (emphasis supplied); Medical Malpractice Recommendations at 10 (same). Thus, "functional unavailability" occurs when insurance premiums are so costly that physicians do not obtain coverage despite its availability. The report states that malpractice insurance is "approaching unaffordability, if it has not already reached it," for some high-risk physicians. Id. at 36. However, the Task Force also stated that "medical malpractice insurance has always been available from some source." Id. at 37, 40 ("[T]he Task Force has concluded that there is no genuine availability problem... ."). Cf. De Ayala v. Florida Farm Bureau Cas. Ins., 543 So.2d 204, 206 (Fla. 1989) (workers' compensation program "replace[d] an unwieldy tort system that made it virtually impossible for businesses to predict or insure for cost of industrial accidents.") (emphasis supplied). Furthermore, the statute does not remedy the concomitant finding that as a result of the inability to obtain coverage, injured persons will not be able to recover damages; the statute does not mandate insurance coverage.
[23] The legislature also found that a damage cap incentive reduces high litigation costs. That problem, endemic in all litigation, is not sufficiently compelling to warrant a cap on damages. See Overland Constr. Co., Inc. v. Sirmons, 369 So.2d 572 (Fla. 1979); but see American Liberty Ins. Co. v. West & Conyers, Architects & Engineers, 491 So.2d 573 (Fla. 2d DCA 1986). The option to settle meritorious claims, resulting in reduced litigation costs, has always been available.
[24] These alternatives included mandating proof of gross negligence in some situations, providing more specific jury instructions on damages, limiting or abolishing punitive damages, and changing the collateral source offset.