618 So.2d 189 (1993)
UNIVERSITY OF MIAMI, etc., Appellant,
v.
Patricia ECHARTE, etc., et al., Appellees.
No. 78210.
Supreme Court of Florida.
May 13, 1993.
*190 Steven E. Stark and Michael L. Friedman of Fowler, White, Burnett, Hurley, Banick & Strickroot, P.A., Miami, for appellant.
Joel D. Eaton and Joel S. Perwin of Podhurst, Orseck, Josefsberg, Eaton, Meadow, Olin & Perwin, P.A., and Grossman & Roth, P.A., Miami, for appellees.
Robert A. Butterworth, Atty. Gen. and Louis F. Hubener, Asst. Atty. Gen., Tallahassee, amicus curiae for State of Fla.
James E. Tribble of Blackwell & Walker, P.A., Miami, amicus curiae for Florida Defense Lawyers Ass'n, Inc.
Julian Clarkson of Holland & Knight, Tallahassee, and David W. Spicer of Bobo, Spicer, Ciotoli & Fulford, West Palm Beach, amicus curiae for Physicians Protective Trust Fund.
Robert M. Klein of Stephens, Lynn, Klein & McNicholas, P.A., Miami, amicus curiae for Florida Medical Ass'n, Florida Hosp. Ass'n and American Medical Ass'n.
Cheryl S. Flax-Davidson, Washington, DC, amicus curiae for Ass'n of Trial Lawyers of America.
Roy D. Wasson, Miami, amicus curiae for Academy of Florida Trial Lawyers.
HARDING, Justice.
We have for review University of Miami v. Echarte, 585 So.2d 293 (Fla. 3d DCA 1991), in which the Third District Court of Appeal affirmed the trial court's ruling that sections 766.207 and 766.209, Florida Statutes (Supp. 1988), violated the Florida Constitution. We have jurisdiction based on article V, section 3(b)(1) of the Florida Constitution.
The issue here is whether sections 766.207 and 766.209, which provide a monetary cap on noneconomic damages in medical malpractice claims when a party requests arbitration, violate a claimant's right of access to the courts.[1] We find that the statutes at issue provide a commensurate benefit to the plaintiff in exchange for the monetary cap, and thus, we hold the statutes satisfy the right of access to the courts test set forward in Kluger v. White, 281 So.2d 1 (Fla. 1973).
The University of Miami[2] (University) treated Patricia Echarte, a minor, for a brain tumor. However, as a result of the University's alleged negligence, Patricia's right hand and forearm had to be amputated in order to save her life. Patricia and her parents (Echartes) gave the University notice of intent to initiate a malpractice action.[3] In response, the University requested that the Echartes submit their damages to a medical negligence arbitration panel pursuant to section 766.207(2). The Echartes filed an action for a declaratory judgment questioning the constitutionality of sections 766.207 and 766.209.
*191 The trial court ruled that the statutes violated the Echartes' constitutional right of access to the courts, right to trial by jury,[4] equal protection guarantees,[5] and procedural and substantive due process rights;[6] violated the single subject requirement;[7] constituted a taking without compensation;[8] and involved an improper delegation of authority.[9] On appeal the district court affirmed the trial court's holding, but limited its discussion to the right of access to the courts.[10] Similarly, we limit our discussion to the validity of the statutes under the right of access to the courts. However, we have also considered the other constitutional claims and hold that the statutes do not violate the right to trial by jury, equal protection guarantees, substantive or procedural due process rights, the single subject requirement, the taking clause, or the non-delegation doctrine.
The Legislature enacted the statutory scheme at issue following the recommendations and study made by the Academic Task Force for Review of the Insurance and Tort Systems (Task Force).[11] In studying medical malpractice insurance costs, the Task Force found that the
primary cause of increased malpractice premiums has been the substantial increase in loss payments to claimants and not excessive insurance company profits nor the insurance industry underwriting cycle. Further, the Task Force found that the dramatic increase in the size or amounts of paid claims was the major cause of the increase in total claims payments; the frequency of claims against physicians increased only slightly. In particular, the size and increasing frequency of the very large claims were found to be a problem. Finally, attorneys' fees and other litigations costs were found to represent approximately 40 percent of the total costs of insurance companies, while claimants received 43.1 percent of the insurers' total incurred costs. During the past eleven years, the average cost of defending a malpractice claim had increased at an annual compound rate of seventeen percent.
Academic Task Force for Review of the Insurance and Tort Systems, Medical Malpractice Recommendations at 10-11 (Nov. 6, 1987) (footnotes omitted) (on file with H.R.Comm. on Ins., The Capitol). The Task Force recommended implementation of a medical malpractice plan designed to stabilize and reduce medical liability premiums. The recommended plan included that parties conduct a reasonable investigation preceding malpractice claims and defenses in order to eliminate frivolous claims and defenses, and incentives for parties to arbitrate medical malpractice claims in order to reduce litigation expenses. The Legislature adopted the Task Force's recommendations and findings in chapter 88-1, Laws of Florida,[12] and section 766.201, Florida *192 Statutes (Supp. 1988).[13] The statutes at issue are two components recommended by the Task Force to address the medical liability insurance crisis: 1) a presuit investigation process to eliminate frivolous claims and 2) a voluntary arbitration process to encourage settlement of claims.
Sections 766.203-.206 set out the presuit investigation procedure that both the claimant and defendant must follow before a medical negligence claim may be brought in court. The first step in the presuit investigation is for the claimant to determine whether reasonable grounds exist to believe that a defendant acted negligently in the claimant's care or treatment, and that this negligence caused the claimant's injury. § 766.203(2), Fla. Stat. (Supp. 1988). Section 766.203(2) also requires that the medical negligence claim be corroborated by a "verified written medical expert opinion" before giving notice to a defendant. After the claimant has established the reasonable grounds to believe that negligence occurred, the defendant or defendant's insurer *193 is required to conduct a presuit investigation. § 766.203(3), Fla. Stat. (Supp. 1988).
If the claimant's reasonable grounds for the medical negligence claim are intact at the completion of the presuit investigation, either party may request that a medical arbitration panel determine the amount of damages. § 766.207(2), Fla. Stat. (Supp. 1988). Section 766.207 provides that upon such request, the opposing party's agreement to participate in arbitration binds both parties to the arbitration panel's decision and precludes other remedies by the claimant against the defendant.
Under section 766.207(7) a claimant can recover net economic damages of past and future medical expenses and eighty percent of lost wages and earning capacity. The claimant's noneconomic damages[14] are "limited to a maximum of $250,000 per incident," and are "calculated on a percentage basis with respect to capacity to enjoy life."[15] § 766.207(7). Finally, section 766.211, Florida Statutes (Supp. 1988), provides for prompt payment of the award to the claimant, including interest at the legal rate and a penalty rate if the defendant fails to pay within ninety days of the award.
Section 766.207(7) holds the defendant responsible for the prompt payment of the arbitration award and interest on all accrued damages, payment of the claimant's reasonable attorney's fees and costs as determined by the arbitration panel up to fifteen percent of the award, and payment of all arbitration costs. In addition, section 766.207(7)(h) holds each defendant participating in the arbitration proceeding jointly and severally liable for all damages assessed by the panel. Section 766.207(7)(k) provides that if a defendant rejects a claimant's offer to arbitrate, then section 766.209(3), Florida Statutes (Supp. 1988), applies; and if a claimant rejects a defendant's offer to arbitrate, then section 766.209(4), Florida Statutes (Supp. 1988) applies.
Section 766.209(3) provides that if the defendant refuses arbitration, the claimant proceeds to trial without any limitation on damages and is entitled to receive reasonable attorney's fees up to twenty-five percent of the award. Section 766.209(4) provides that if a claimant refuses a defendant's offer to arbitrate, then a claimant proceeds to trial; however, noneconomic damages are capped at $350,000 per incident.
The seminal case in a constitutional challenge to the right of access to courts is Kluger v. White, 281 So.2d 1 (Fla. 1973). In Kluger, this Court invalidated a statute requiring a minimum of $550 property damages arising from an automobile accident before bringing an action. This Court held that:
[w]here a right of access to the courts for redress for a particular injury has been provided by statutory law predating the adoption of the Declaration of Rights of the Constitution of the State of Florida, or where such right has become a part of the common law of the State pursuant to Fla. Stat. § 2.01, F.S.A., the Legislature is without power to abolish such a right without providing a reasonable alternative to protect the rights of the people of the State to redress for injuries, unless the Legislature can show an overpowering public necessity for the abolishment of such right, and no alternative method of meeting such public necessity can be shown.
Kluger 281 So.2d at 4. Based upon the Kluger test, this Court has also invalidated a portion of a tort reform statute that placed a cap on all noneconomic damages in Smith v. Department of Insurance, 507 So.2d 1080 (Fla. 1987), because the statute *194 did not provide claimants with a commensurate benefit. Id. at 1088. Thus, the law is clear that the Legislature cannot restrict damages by either enacting a minimum damage amount or a monetary damage cap without meeting the Kluger test. Id.
The initial question in the instant case is whether the arbitration statutes, which include the non-economic damage caps found in sections 766.207 and 766.209, provide claimants with a "commensurate benefit" for the loss of the right to fully recover non-economic damages. Sections 766.207 and 766.209 only limit a claimant's right to recover non-economic damages after a defendant agrees to submit the claimant's action to arbitration. The defendant's offer to have damages determined by an arbitration panel provides the claimant with the opportunity to receive prompt recovery without the risk and uncertainty of litigation or having to prove fault in a civil trial. A defendant or the defendant's insurer is required to conduct an investigation to determine the defendant's liability within ninety days of receiving the claimant's notice to initiate a malpractice claim. § 766.106(3)(a). Before the defendant may deny the claimant's reasonable grounds for finding medical negligence, the defendant must provide a verified written medical expert opinion corroborating a lack of reasonable grounds to show a negligent injury. § 766.203(3)(b). The claimant benefits from the requirement that a defendant quickly determine the merit of any defenses and the extent of its liability. The claimant also saves the costs of attorney and expert witness fees which would be required to prove liability. Further, a claimant who accepts a defendant's offer to have damages determined by an arbitration panel receives the additional benefits of: 1) the relaxed evidentiary standard for arbitration proceedings as set out by section 120.58, Florida Statutes (1989); 2) joint and several liability of multiple defendants in arbitration; 3) prompt payment of damages after the determination by the arbitration panel; 4) interest penalties against the defendant for failure to promptly pay the arbitration award; and 5) limited appellate review of the arbitration award requiring a showing of "manifest injustice."
We reject the district court's conclusion that the medical malpractice arbitration statutes do not provide a claimant with commensurate benefits. The district court found that because the medical malpractice arbitration statutes do not provide a no-fault basis for recovery or mandatory insurance coverage to assure recovery, like workers' compensation laws, the arbitration statutes did not provide a commensurate benefit. The district court's conclusion fails to recognize that medical malpractice arbitration statutes are less restrictive than the workers' compensation statutes, and that the Task Force specifically considered and rejected both a no-fault alternative system of compensation and a mandatory insurance pool as means to control increases in the medical malpractice insurance rates.[16]
We find that a claimant's rights are restricted less by the medical malpractice arbitration statutes than by the workers' compensation statutes. Unlike a claimant under the workers' compensation statute, a claimant under the medical malpractice arbitration statutes may recover some non-economic damages. Furthermore, in considering a no-fault system, the Task Force stated that for most medical injuries
the Task Force does not recommend a no-fault compensation alternative to the tort system. This negative conclusion is compelled by findings that a comprehensive no fault system for all medical injuries would be prohibitively expensive, many times more expensive than the existing medical malpractice systems. In order to develop a no-fault system at reasonable cost, it is necessary to establish a framework for distinguishing compensable events from noncompensable events. In most areas of medical injury, this is not economically feasible at the present time. For example, defining the compensable *195 event for a no-fault plan to cover medical injuries in emergency rooms and trauma centers would require terms broad enough to include injuries of every degree to any part of the body resulting from an unlimited variety of medical interventions. Because of its expansive potential, such a broad definition of the compensable event would make no-fault insurance costs prohibitively expensive, at worst, and impossible to predict, at best.
Medical Malpractice Recommendations at 31-32. The Task Force also rejected a proposal which would require all physicians to buy into a state-operated insurance pool in order to provide a mandatory first layer of medical malpractice insurance. The Task Force explained that such a plan "could effectively destroy any existing vitality and competitiveness in the private market for medical malpractice insurance in the state of Florida." Medical Malpractice Recommendations at 49. Further, the Task Force noted that placing all physicians in a state-operated insurance pool would have the effect of charging physicians who practice in low-risk areas of medicine higher premiums in order to subsidize the high cost of premiums for physicians who practice in high-risk areas. The Task Force specifically rejected such mandatory insurance plans as being overly intrusive into the insurance market and economically undesirable. Id.
The Task Force's recommendations to the Legislature not to adopt a no-fault system or mandatory insurance program are based on an extensive study of the complex causes of the increases in medical malpractice insurance rates. According to the Task Force's report the solutions the Legislature implemented to meet the workers' compensation problem are not effective to answer the medical malpractice insurance liability crisis. The unique facts surrounding medical malpractice required the Legislature to tailor a different solution to solve the crisis. Thus, the district court erred in holding that the medical arbitration statutes did not provide a commensurate benefit because the arbitration statutes did not provide the same benefits as the workers' compensation statutes.
Even if the medical malpractice arbitration statutes at issue did not provide a commensurate benefit, we would find that the statutes satisfy the second prong of Kluger which requires a legislative finding that an "overpowering public necessity" exists, and further that "no alternative method of meeting such public necessity can be shown." Kluger, 281 So.2d at 4. The determination of whether the Legislature made a showing of an "overpowering public necessity" must be interpreted in light of our previous line of cases addressing the Legislature's attempts to abolish other causes of action.
In Kluger, the Court discussed an earlier decision, Rotwein v. Gersten, 160 Fla. 736, 36 So.2d 419 (1948), which upheld the Legislature's abolishment of the common law rights that provided for causes of action for alienation of affections, criminal conversation, seduction, and breach of contract to marry. The Court in Rotwein found that the preface to the Florida Statute abolishing these causes of action stated that they had "been subject to grave abuses, causing extreme annoyance, embarrassment, humiliation and pecuniary damages to many persons wholly innocent and free from wrongdoing." Id. at 738, 36 So.2d at 420. The Court stated that these causes of actions had "become an instrument of extortion and blackmail" and therefore the Legislature could abolish them. Id. at 739, 36 So.2d at 421. This Court in Kluger interpreted the language from Rotwein as the legislative showing that a "public necessity" existed for the abolishment of the right to sue. Kluger, 281 So.2d at 4.
The Court in Kluger held that the Legislature had not shown an "overpowering public necessity" to abolish the right to sue an automobile tortfeasor for property damage. In fact, chapter 71-252, Laws of Florida, which enacted the challenged statute in Kluger, did not contain any factual or policy determinations to support the existence of an "overpowering public necessity." Recently in Psychiatric Associates v. Siegel, 610 So.2d 419 (Fla. 1992), this Court *196 found that the Legislature showed an "overpowering public necessity" in the preamble to the challenged statutes. Id. at 424 n. 7.
In the instant case, the Legislature set out its factual findings in the preamble of chapter 88-1, which initially enacted the Task Force's recommendations. In fact, the preamble in chapter 88-1 states in part:
[I]t is the sense of the Legislature that if the present crisis is not abated, many persons who are subject to civil actions will be unable to purchase liability insurance, and many injured persons will therefore be unable to recover damages for either their economic losses or their non-economic losses. .. .
Ch. 88-1. This preamble clearly states the Legislature's conclusion that the current medical malpractice insurance crisis constitutes an "overpowering public necessity." Moreover, the Legislature made a specific factual finding that "[m]edical malpractice liability insurance premiums have increased dramatically in recent years, resulting in increased unavailability of malpractice insurance for some physicians." § 766.201(1)(a).
The Legislature's factual and policy findings are supported by the Task Force's findings in its report. See Academic Task Force for Review of the Insurance and Tort Systems, Preliminary Fact-Finding Report on Medical Malpractice (Aug. 14, 1987) (hereinafter Fact-Finding Report.)[17] Among its many findings, the Task Force found that: 1) a family physician who performs no surgery and practiced outside Dade and Broward Counties saw a 229% increase in medical malpractice insurance premiums for the period of 1983 to July 1, 1987; and 2) a family physician who performs no surgery and practices in Dade or Broward County saw a 300% increase in medical malpractice insurance premiums for the same period. Furthermore, the Task Force found that rates for specialties also increased sharply. For example, the rates for obstetricians increased by 444% in Dade and Broward Counties, as compared to 304% in the rest of the state.[18] These facts support the Legislature's conclusion that increased costs in medical malpractice insurance premiums have resulted in increased health care costs and made liability insurance "functionally unavailable" for some physicians.[19]
In the instant case, the district court held that "the legislature has not demonstrated the requisite overpowering public necessity for restricting claimant's noneconomic damages." Echarte, 585 So.2d at 301. We disagree. The Legislature has the final word on declarations on public policy, and the courts are bound to give great weight to legislative determinations of facts. See American Liberty Ins. Co. v. West & Conyers Architects & Engineers, 491 So.2d 573 (Fla. 2d DCA 1986). Further, legislative determinations of public purpose and facts are presumed correct and entitled to deference, unless clearly erroneous. See State v. Division of Bond Fin., 495 So.2d 183 (Fla. 1986), and Miami Home Milk Producers Ass'n v. Milk Control Bd., 124 Fla. 797, 169 So. 541 (1936). Because the Legislature's factual and policy findings are presumed correct and there has been no showing that the findings in the instant case are clearly erroneous, we *197 hold that the Legislature has shown that an "overpowering public necessity" exists.
The next question is whether "no alternative method" for meeting the public necessity can be shown. Kluger, 281 So.2d at 4. The district court held that the Legislature did not satisfy the second prong of the Kluger test because the "legislature did not expressly find that no alternative method existed." Echarte, 585 So.2d at 301. We disagree and find that the record supports the conclusion that no alternative or less onerous method exists.
The Task Force's recommendations to the Legislature concerning solutions to the medical malpractice insurance crisis included "civil justice reforms, strengthened regulation of the medical profession and a proposal to provide immediate relief for physicians who experience genuine financial difficulty as a result of high premiums." Medical Malpractice Recommendations at 9. The Task Force stated that it believed that "reforms of the civil justice system, of the medical regulatory system, and of the insurance system complement each other" and that "[a]ll are necessary to address the complex problems with multiple causes analyzed in the Preliminary Fact-Finding Report on Medical Malpractice." Medical Malpractice Recommendations at 9. The conclusion that no alternative or less onerous method of meeting the public necessity is supported by the Legislature's actions in adopting both the Task Force's recommendations to enact the arbitration statutes and strengthen regulation of the medical profession. Therefore, in determining whether no alternative means exists to meet the public necessity of ending the medical malpractice crisis, the plan as a whole, rather than focusing on one specific part of the plan, must be considered.
The Echartes dispute the conclusion that the arbitration statutes are the only alternative means to reduce the medical malpractice insurance rates. They point out that the Task Force's findings show that from 1975 to 1986, approximately 4% of all practicing physicians had two or more claims, but were responsible for 42.2% of the total amount of paid claims. Fact-Finding Report at 144. Thus, the Echartes conclude that an alternative method to reducing claims would be to strengthen professional discipline of physicians with numerous claims.
The reduction of the frequency and severity of malpractice would certainly diminish the amount of loss payments and subsequently medical malpractice rates. However, the Echartes' conclusion that professional discipline alone is an alternative method to meet the public necessity of controlling medical malpractice insurance premiums is erroneous. The Task Force specifically stated that even though a small percentage of the physicians were responsible for 42.2% of the total claims paid out, the facts did not support the conclusion that these doctors were incompetent. As the Task Force found:
There are a number of reasons why a physician with multiple claims should not be considered a "bad" doctor. Multiple claims could occur because a physician is practicing in a high risk speciality or a high risk area of the state. In addition, some physicians may be more willing to treat high risk patients for which unfavorable results are to be expected more frequently.
Fact-Finding Report at 142. Moreover, the Task Force specifically found that:
Strengthened regulation of medical care providers is not a substitute for tort and insurance reform, but does complement other reforms. The Task Force does not believe that the Legislature is faced with a choice between civil justice reform and strengthened regulation of physicians. Rather, effective reform must include both.
Medical Malpractice Recommendations at 37. Thus, it is clear that both the arbitration statute, with its conditional limits on recovery of noneconomic damages, and the strengthened regulation of the medical profession are necessary to meet the medical malpractice insurance crisis. Further, no alternative or less onerous method of meeting the crisis has been shown. Therefore, *198 we hold that the second prong of Kluger is satisfied.
Accordingly, we hold that sections 766.207 and 766.209 are constitutional. The district court's decision is reversed and the case is remanded for proceedings consistent with this opinion.
It is so ordered.
OVERTON, McDONALD and GRIMES, JJ., concur.
BARKETT, C.J., dissents with an opinion, in which SHAW, J., concurs.
SHAW, J., dissents with an opinion, in which BARKETT, C.J., concurs.
KOGAN, J., recused.
BARKETT, Chief Justice, dissenting.
I agree with Justice Shaw that the statutes in question violate article I, section 21 of the Florida Constitution. I also believe the statutes violate the right to trial by jury and the equal protection clauses of the Florida and United States Constitutions.
As the trial court noted, under the statutory scheme plaintiffs must elect between arbitration and their right to a trial by jury, which is guaranteed by article I, section 22 of the Florida Constitution. If seriously injured plaintiffs choose to go to trial, their noneconomic damages are arbitrarily capped at $350,000. In Smith v. Department of Insurance, 507 So.2d 1080 (Fla. 1987), this Court stated that the constitutional guarantee of access to courts must be read in conjunction with the right to a jury trial:
Access to courts is granted for the purpose of redressing injuries. A plaintiff who receives a jury verdict for, e.g., $1,000,000, has not received a constitutional redress of injuries if the Legislature statutorily, and arbitrarily, caps the recovery at $450,000. Nor, we add, because the jury verdict is being arbitrarily capped, is the plaintiff receiving the constitutional benefit of a jury trial as we have heretofore understood that right.
Id. at 1088-89. The reasoning in Smith is equally applicable to the arbitrary damage caps at issue in this case.
The statutes also violate equal protection guarantees by creating two classes of medical malpractice victims, those with serious injuries whose recovery is limited by the caps and those with minor injuries who receive full compensation. This Court has made clear that similarly situated persons are equal under the law and must be treated alike. Palm Harbor Special Fire Control Dist. v. Kelly, 516 So.2d 249, 251 (Fla. 1987); Lasky v. State Farm Ins. Co., 296 So.2d 9, 18 (Fla. 1974). Statutory classifications at a minimum must bear some reasonable relationship to a permissive legislative objective and not be discriminatory, arbitrary, or oppressive. Abdala v. World Omni Leasing, Inc., 583 So.2d 330, 333 (Fla. 1991).
I fail to see how singling out the most seriously injured medical malpractice victims for less than full recovery bears any rational relationship to the Legislature's stated goal of alleviating the financial crisis in the medical liability insurance industry. Ch. 88-1, Preamble, Laws of Fla. (amended and reenacted ch. 88-277, Laws of Fla.), See Florida Medical Ctr., Inc. v. Von Stetina, 436 So.2d 1022, 1027 (Fla. 4th DCA 1983), rev'd on other grounds sub nom. Florida Patient's Compensation Fund v. Von Stetina, 474 So.2d 783 (Fla. 1985). Such a classification offends the fundamental notion of equal justice under the law and can only be described as purely arbitrary and unrelated to any state interest. Vildibill v. Johnson, 492 So.2d 1047, 1050 (Fla. 1986).
Moreover, the Task Force's Medical Malpractice Recommendations, which were relied on by the Legislature in enacting the noneconomic damage caps, do not establish an "overwhelming public necessity" for restricting the access to courts. Nor do the recommendations show that no reasonable alternative exists. Kluger v. White, 281 So.2d 1, 4 (Fla. 1973).
Indeed, the recommendations conclude that reducing medical negligence is the best way to resolve the medical malpractice insurance "crisis" and state that inadequate discipline of physicians contributes substantially to the problem:

*199 Obviously, a reduction in the occurrence of medical injuries is the most desirable manner in which to reduce the costs of the medical malpractice systems. In its Preliminary Fact-Finding Report on Medical Malpractice, the Task Force found that nearly one half the amount of paid claims during the period 1975 through 1986 was accounted for by physicians with two or more paid claims. Further, the report concluded that the Department of Professional Regulation disciplines a small percentage of physicians with multiple paid claims.
Academic Task Force for Review of the Insurance and Tort Systems, Medical Malpractice Recommendations, at 13 (Nov. 6, 1987) (emphasis supplied). When the problems in the medical malpractice insurance industry arguably can be eased by means much less onerous than restricting the rights of victims of established medical malpractice to redress their injuries, I cannot find that "no alternative method" has been shown.[20]Kluger, 281 So.2d at 4; Overland Const. Co. v. Sirmons, 369 So.2d 572, 574 (Fla. 1979).
For the reasons stated above, I would find the statutes unconstitutional.
SHAW, J., concurs.
SHAW, Justice, dissenting.
I agree with the courts below that sections 766.207 and 766.209, Florida Statutes (Supp. 1988), fail the test enunciated in Kluger v. White, 281 So.2d 1 (Fla. 1973), and violate the claimant's right of access to the courts, guaranteed by article I, section 21 of the Florida Constitution. We have said repeatedly that before the constitutionally guaranteed right of access to courts can be taken away, a reasonable alternative must be provided, or the Legislature must show an overpowering public necessity for the abolishment of such right and no alternative method of meeting such public necessity. Kluger, 281 So.2d at 4. We held in Smith:
Neither restriction [on the right of access to courts] is permissible unless one of the Kluger exceptions is met; i.e., (1) providing a reasonable alternative remedy or commensurate benefit, or (2) legislative showing of overpowering public necessity for the abolishment of the right and no alternative method of meeting such public necessity.
Smith v. Department of Ins., 507 So.2d 1080, 1088 (Fla. 1987) (emphasis added).
In the instant case, all agree that the constitutional right of access to courts is being denied and therefore the Kluger test must be met. I disagree with the majority that the statutes provide a reasonable alternative remedy or commensurate benefit to Patricia Echarte in exchange for her common-law right to full "redress for injuries." Kluger, 281 So.2d at 4. Workers' compensation and no-fault automobile statutes were found to be constitutional because they require compulsory insurance coverage and relieve the claimant of the burden of proving fault. See Martinez v. Scanlan, 582 So.2d 1167 (Fla. 1991); De Ayala v. Florida Farm Bureau Cas. Ins. Co., 543 So.2d 204 (Fla. 1989); Smith; Lasky v. State Farm Ins. Co., 296 So.2d 9 (Fla. 1974). The statutory scheme here differs in that it requires the claimant to "conduct an investigation to ascertain that there are reasonable grounds to believe that ... [a]ny named defendant in the litigation was negligent" (i.e., that there was a breach of a duty owed), and that such negligence "resulted in injury to the claimant" (damages). § 766.203(2), Fla. Stat. (Supp. 1988). The statute also mandates that "[c]orroboration of reasonable grounds to initiate medical negligence litigation shall be provided by the claimant's submission of a verified written medical expert opinion from a medical expert." Id. Despite these additional statutory burdens placed upon the claimant, there is no quid pro quo such as requiring the defendant to secure compulsory insurance to assure the claimant a recovery in the event that medical *200 negligence is proved.[21] In other words, the statute makes it more burdensome to sue for medical negligence without providing an assured recovery. The quid pro quo that saved workers' compensation and no-fault automobile statutes from constitutional defect is absent here.
The majority opines that the legislative advantages fall evenly, or at least fairly, upon the injured child and the tortfeasor in this case. I strongly disagree. No amount of bootstrapping or divining legislative intent can obscure reality. To recite that the Legislature had its reasons for failing to provide for compulsory insurance simply begs the question of whether a quid quo pro has been provided. In the absence of compulsory insurance, to assert that prompt payment of damages is ensured is simply fictive.
Equally fictive is the claim that a "relaxed evidentiary standard" is a benefit to the claimant. No analysis is offered to shore up this assertion. The majority has confused a relaxed standard of proof, an advantage to the one who must bear the burden of proof, with a relaxed standard of admitting evidence, an advantage enjoyed equally by all parties. Our courts have made clear that regardless of a relaxed standard of admitting evidence, conclusions must be supported by competent, substantial evidence. See, e.g., State, Dep't of Admin. v. Porter, 591 So.2d 1108, 1109 (Fla. 2d DCA 1992); McDonald v. Department of Banking & Fin., 346 So.2d 569, 585 (Fla. 1st DCA 1977). Thus a relaxed standard of admitting evidence is irrelevant to the quid pro quo evaluation.
The negligent party can unilaterally limit the claimant's noneconomic damages, § 766.207(2), whether the claimant accepts arbitration, § 766.207(7)(b), or goes to trial. § 766.209(4)(a). The instant statute presents the classic case of "heads I win, tails you lose." The district court correctly observed that the benefits of the statutes are not balanced between the patient-claimant and the tortfeasor: a medical patient obtains no particular benefit from a cap placed on noneconomic damages. The benefit of the damage cap inures only to the negligent defendant. University of Miami v. Echarte, 585 So.2d 293, 299 (Fla.3d DCA 1991) (citing Smith, 507 So.2d at 1088). Again this is in contrast to the no-fault automobile reparations statutes, where benefits are balanced among all auto owners because an auto owner is as likely to be negligent as to be the victim of another's negligence.
Convinced that no reasonable alternative is provided in exchange for the right taken away, I turn my attention to whether the alternative prong of the Kluger test has been satisfied  has the Legislature "shown" "an overpowering public necessity for the abolishment of such right, and no alternative method of meeting such public necessity"? Kluger, 281 So.2d at 4; Smith, 507 So.2d at 1088. I read "shown" to mean "shown by competent, substantial evidence." Here the Legislature has shown neither an overpowering public necessity to cap noneconomic damages nor the absence of an alternative method. The Legislature failed to make such showing despite numerous "whereas" clauses in the adopting legislation, including "findings."[22] Significantly, the final report of the Task Force, the document on which the *201 Legislature bases its findings, does not posit a cap on noneconomic damages as the sole solution to the crisis in the medical insurance industry.[23] In fact, it expressly cautions against unwarranted conclusions.[24] There is thus an absence of competent, substantial evidence showing that no alternative method of meeting an overpowering public necessity exists. The majority recites the reasons why the Legislature chose the method it did, as if this recitation were an adequate substitute for the required Kluger findings. It is not. Indeed the task force points to other methods of meeting the alleged public necessity, i.e., vigilant management of medical malpractice. See Academic Task Force for Review of the Insurance and Tort Systems, Medical Malpractice Recommendations 13 (November 6, 1987) (calling for a "comprehensive reform package designed to strengthen professional regulation of the medical profession," creating a division within the Florida Department of Professional Regulation to "assume comprehensive responsibility for medical professional discipline and quality assurance"). The fact that the Legislature considered and rejected other methods is additional proof that the Kluger test has not been met. We said in Kluger:
[We cannot] adopt a view which would allow the Legislature to destroy a traditional and long-standing cause of action upon mere legislative whim, or when an alternative approach is available.

We hold, therefore, ... the Legislature is without power to abolish such a right ... unless the Legislature can show an overpowering public necessity for the abolishment of such right, and no alternative method of meeting such public necessity can be shown.
Kluger, 281 So.2d at 4-5 (emphasis added). The majority engrafts a new "no less onerous method" test onto the established "no alternative method" test. Majority op. at 197. This is a departure from the Kluger test, which is an admittedly burdensome test. This is however as it should be when a constitutionally guaranteed right is being taken away. It also departs from our recent decision in Psychiatric Associates v. Siegel, 610 So.2d 419 (Fla. 1992), where we held a statute unconstitutional because although an overpowering public necessity was shown, the record failed to show that the solution adopted by the Legislature was "the only method meeting the medical malpractice crisis and encouraging peer review." Id. at 425. The majority offers no authority for its departure from the holding of Siegel and Kluger.
The majority also erroneously implies that it is the Echartes' burden to show that no alternative method of meeting a public necessity exists. Majority op. at 197, 198. We have held however that the Legislature bears this burden. We said in Smith:
In Kluger, the legislature attempted to unconstitutionally restrict the right of redress at the bottom of the damage spectrum; here, it attempts to restrict the top of the spectrum. Neither restriction is permissible unless one of the Kluger exceptions is met; i.e., (1) providing a *202 reasonable alternative remedy or commensurate benefit, or (2) legislative showing of overpowering public necessity for the abolishment of the right and no alternative method of meeting such public necessity.
Smith, 507 So.2d at 1088 (emphasis added).
The majority's naked assertion that "we have also considered the other constitutional claims and hold that the statutes do not violate the right to trial by jury, equal protection guarantees, substantive or procedural due process rights, the single subject requirement, the taking clause, or an improper delegation of power," majority opinion at 191, is devoid of analysis. I can with equal force assert that I have "considered the other constitutional claims" and find them all persuasive.
The law requires that when a statutory benefit is being given in lieu of a constitutionally protected right the statutory benefit must accrue to the particular claimant, not to the public at large. We held in Smith that a general assertion of benefits will not pass constitutional muster. 507 So.2d at 1089. A benefit enjoyed by the general public at the expense of a particular claimant is a taking of the claimant's property without compensation, in violation of the state and federal constitutions. Art. I, § 9, art. X, § 6(a), Fla. Const.; U.S. Const. amends. V, XIV; see Dade County v. Still, 377 So.2d 689 (Fla. 1979) (ordinance taking portion of respondents' property for public good cannot be used to reduce compensation).
Finally, the statutes deny equal protection, for the reasons ably set out by Chief Justice Barkett in her dissent, and draw an arbitrary line between recovery and nonrecovery without regard to the actual damages caused by a defendant's malpractice. By allowing the less seriously injured to recover full damages while denying full compensation to the more seriously injured, the statutes operate with increasing capriciousness as the severity of the injury increases  the greater the injury the greater the deprivation of recovery.
For these many reasons I would approve the decisions of the trial and district courts.
BARKETT, C.J., concurs.
NOTES
[1] Art. I, § 21, Fla. Const.
[2] The University of Miami d/b/a The University of Miami School of Medicine, a Florida Corporation.
[3] Echarte filed notice of intent pursuant to section 766.106, Florida Statutes (Supp. 1988).
[4] Art. I, § 22, Fla. Const.
[5] Art. I, § 2, Fla. Const.; U.S. Const. amend. XIV, § 1.
[6] Art. I, § 9, Fla. Const.; U.S. Const. amend. XIV, § 1.
[7] Art. III, § 6, Fla. Const.
[8] Art. X, § 6(a), Fla. Const.
[9] Art. II, § 3, Fla. Const.
[10] The district court expressly declined to discuss the trial court's other constitutional rulings.
[11] The Legislature established the Task Force in the Tort Reform and Insurance Act of 1986. Ch. 86-160, § 63, Laws of Fla. The Legislature based its findings on the Task Force's reports. Chapter 88-1, Laws of Florida, amended and reenacted by chapter 88-277, Laws of Florida. The Task Force's reports are: Preliminary Fact-Finding Report on Medical Malpractice, Aug. 14, 1987; Medical Malpractice Reform Alternatives, Oct. 2, 1987; Medical Malpractice Recommendations, Nov. 6, 1987; and Final Recommendations, March 1, 1988.
[12] Chapter 88-1, Laws of Florida, provides:

WHEREAS, the Legislature finds that there is in Florida a financial crisis in the medical liability insurance industry, and
WHEREAS, it is the sense of the Legislature that if the present crisis is not abated, many persons who are subject to civil actions will be unable to purchase liability insurance, and many injured persons will therefore be unable to recover damages for either their economic losses or their noneconomic losses, and
WHEREAS, the people of Florida are concerned with the increased cost of litigation and the need for a review of the tort and insurance laws, and
WHEREAS, the Legislature believes that, in general, the cost of medical liability insurance is excessive and injurious to the people of Florida and must be reduced, and
WHEREAS, the Legislature finds that there are certain elements of damage presently recoverable that have no monetary value, except on a purely arbitrary basis, while other elements of damage are either easily measured on a monetary basis or reflect ultimate monetary loss, and
WHEREAS, the Legislature desires to provide a rational basis for determining damages for noneconomic losses which may be awarded in certain civil actions, recognizing that such noneconomic losses should be fairly compensated and that the interests of the injured party should be balanced against the interests of society as a whole, in that the burden of compensating for such losses is ultimately borne by all persons, rather than by the tortfeasor alone, and
WHEREAS, the Legislature created the Academic Task Force for Review of the Insurance and Tort Systems which has studied the medical malpractice problems currently existing in the State of Florida, and
WHEREAS, the Legislature has reviewed the findings and recommendations of the Academic Task Force relating to medical malpractice, and
WHEREAS, the Legislature finds that the Academic Task Force has established that a medical malpractice crisis exists in the State of Florida which can be alleviated by the adoption of comprehensive legislatively enacted reforms, and
WHEREAS, the magnitude of this compelling social problem demands immediate and dramatic legislative action, NOW, THEREFORE, ... .
[13] Section 766.201, Florida Statutes (Supp. 1988), provides in pertinent part:

(1) The Legislature makes the following findings:
(a) Medical malpractice liability insurance premiums have increased dramatically in recent years, resulting in increased medical care costs for most patients and functional unavailability of malpractice insurance for some physicians.
(b) The primary cause of increased medical malpractice liability insurance premiums has been the substantial increase in loss payments to claimants caused by tremendous increases in the amounts of paid claims.
(c) The average cost of defending a medical malpractice claim has escalated in the past decade to the point where it has become imperative to control such cost in the interests of the public need for quality medical services.
(d) The high cost of medical malpractice claims in the state can be substantially alleviated by requiring early determination of the merit of claims, by providing for early arbitration of claims, thereby reducing delay and attorney's fees, and by imposing reasonable limitations on damages, while preserving the right of either party to have its case heard by a jury.
(e) The recovery of 100 percent of economic losses constitutes overcompensation because such recovery fails to recognize that such awards are not subject to taxes on economic damages.
(2) It is the intent of the Legislature to provide a plan for prompt resolution of medical negligence claims. Such plan shall consist of two separate components, presuit investigation and arbitration. Presuit investigation shall be mandatory and shall apply to all medical negligence claims and defenses. Arbitration shall be voluntary and shall be available except as specified.
(a) Presuit investigation shall include:
1. Verifiable requirements that reasonable investigation precede both malpractice claims and defenses in order to eliminate frivolous claims and defenses.
2. Medical corroboration procedures.
(b) Arbitration shall provide:
1. Substantial incentives for both claimants and defendants to submit their cases to binding arbitration, thus reducing attorney's fees, litigation costs, and delay.
2. A conditional limitation on noneconomic damages where the defendant concedes willingness to pay economic damages and reasonable attorney's fees.
3. Limitations on the noneconomic damages components of large awards to provide increased predictability of outcome of the claims resolution process for insurer anticipated losses planning, and to facilitate early resolution of medical negligence claims.
[14] Noneconomic damages are defined as "nonfinancial losses which would not have occurred but for the injury giving rise to the cause of action, including pain and suffering, inconvenience, physical impairment, mental anguish, disfigurement, loss of capacity for enjoyment of life, and other nonfinancial losses." § 766.202(7), Fla. Stat. (Supp. 1988).
[15] Section 766.207(7)(b), Florida Statutes (Supp. 1988), gives the following example of how this calculation is made: If the arbitration panel finds that the "claimant's injuries resulted in a 50-percent reduction in [his or her] capacity to enjoy life [such a finding] would warrant an award of not more than $125,000 noneconomic damages."
[16] The Task Force recommended a no-fault compensation alternative in the narrow area of birth related neurological injuries, but rejected it for other types of medical injuries. Medical Malpractice Recommendations at 31.
[17] The Task Force stated in the Fact-Finding Report that its full-time research staff based their findings on the following: 1) seven public meetings and hearings in Tampa and Miami to receive presentations, recommendations and comments from experts and interested citizens; 2) a comprehensive literature search and review; and 3) eight research projects conducted in Florida which surveyed medical malpractice claims, closed claims, loss payments, profitability and other aspects of the insurance companies; studied data from the Insurance Services Office, a non-profit organization which collects data and files rate applications for liability carriers nationwide; a survey of 1,500 randomly selected physicians; a survey of 1,500 attorneys who regularly handle tort cases; conducted a computer analysis of the financial situation of commercial liability insurance carriers; and an analysis of Florida's civil litigation rates. The Academic Task Force then conducted a six-hour hearing in Gainesville to preview the preliminary findings from the eight research projects. Fact-Finding Report at 23-24.
[18] Fact-Finding Report at 26-31.
[19] Fact-Finding Report at 36, 239-40.
[20] The fact that numerous sections of the medical malpractice reform legislation were directed at regulation, discipline, and prevention of malpractice is immaterial. Those sections, if anything, demonstrate the Legislature's recognition of alternative methods.
[21] The district court correctly noted that:

Here, a defendant retains causation defenses and the claimant must demonstrate reasonable grounds to initiate medical negligence litigation, § 766.203(2), Fla. Stat. (Supp. 1988), through an extensive presuit investigation procedure. §§ 766.106, .203-.206, Fla. Stat. (Supp. 1988); see Fla.R.Civ.P. 1.650. Thus, although defendant agrees to pay certain damages following presuit screening, the statute does not provide a no-fault basis for recovery. Additionally, because insurance coverage is not mandated, defendant's immunity from liability for noneconomic damages in excess of the cap is not dependent on insurance coverage and claimant is not assured recovery of its allowable losses.
University of Miami v. Echarte, 585 So.2d 293, 299 (Fla. 3d DCA 1991) (footnote omitted).
[22] "Findings" must be supported by competent, substantial evidence. Therefore whether "findings," in the language of the legislature, and "showings," in the language of Kluger v. White, 281 So.2d 1 (Fla. 1973), are synonymous is irrelevant.
[23] The district court, in concluding that the Legislature had not demonstrated the requisite overpowering public necessity for restricting claimant's noneconomic damages, correctly observed:

Although the Task Force found that the "high-end awards are a substantial cause of the increase in paid losses," Medical Malpractice Recommendations, at 26; it failed to differentiate between economic and noneconomic damage awards. Its findings concerning prospective reduction of approximately 2.4% to 11% in loss payments are based on "hypothetical assumptions (rather than empirical data) as to the distribution of economic and noneconomic losses in past paid claim data." Final Recommendations at 62.
Echarte, 585 So.2d at 301 (citation omitted).
[24] As noted by the district court:

The Task Force warned that the "figures are offered only for what they say about relative magnitude [of savings from a cap on medical claims to savings from a cap on other liability claims]. They should not be misinterpreted as vouching for the amount of savings that might be realized from caps on non-economic damages." Final Recommendations at 63.
Echarte, 585 So.2d at 301.