ALTENBERND, Judge.
 

 Allyson Parham, as personal representative of the Estate of Robert L. Gardner (the Personal Representative), appeals a final judgment in a wrongful death, medical malpractice action filed against Florida Health Sciences Center, Inc., d/b/a Tampa General Hospital (TGH). This case involves the death of a premature newborn who was transferred to TGH from another hospital because TGH had a Level III neonatal intensive care unit. The primary dispute in the case centered on the fact that TGH did not have a pediatric surgeon on staff to handle emergencies in the neonatal unit at the time of these events.
 

 In addition to a standard claim of medical negligence, the Personal Representative asserted a theory of fraud in the inducement based on alleged misrepresentations made by the neonatologist on duty at TGH to the transferring physician at the other hospital. The trial court entered a directed verdict on this theory at the close of the plaintiffs case. The jury later returned a verdict in favor of the parents, as survivors, on the medical negligence claim in the amount of
 
 *922
 
 $12,000,000. As a result of posttrial motions, the trial court reduced the award to the mother from $8,000,000 to $350,000. This reduction was based on the limitation or cap of liability for non-economic damages contained in section 766.209(4), Florida Statutes (2003). The trial court also eliminated entirely the award of $4,000,000 to the father.
 

 On appeal, the Personal Representative raises seven issues, which we address as three issues. First, the Personal Representative challenges the limitation of liability imposed on the award to the mother. Given established precedent, we affirm that award.
 
 See Univ. of Miami v. Echarte,
 
 618 So.2d 189 (Fla.1993). However, because the Personal Representative argues that circumstances have changed substantially since the supreme court upheld this statute in 1993, at the conclusion of this opinion we certify the continued constitutionality of this limitation to the supreme court.
 

 Second, the Personal Representative challenges the trial court’s decision to deny the father any compensation. We conclude that the trial court erred in this regard. The fact that the father did not choose to testify at trial did not eliminate the other evidence of his involvement with the child and his entitlement to damages. Although the jury awarded $4,000,000 to the father, on remand, we mandate that judgment be entered in favor of the father in the amount of $350,000 pursuant to section 766.209(4).
 

 Finally, we affirm the trial court’s decision to direct a verdict on the claim of fraud in the inducement. Assuming that such a claim is legally recognized in this context, we conclude that the evidence did not establish a claim that could be submitted to the jury. We note that the Personal Representative assumes that this theory would have been exempt from the limitation on liability under section 766.209(4). In light of our ruling, we do not reach that issue.
 

 I. The Facts
 

 Allyson Parham conceived a child at the beginning of 2003. Although she was not married at the time, the undisputed evidence establishes that Robert Gardner was the father of this child. The child was due in early October.
 

 Ms. Parham developed severe preec-lampsia. As a result, she delivered the child by caesarian section at Winter Haven Hospital on July 26, 2003. The child was named Robert L. Gardner for his father.
 

 The child was delivered about eight weeks early and weighed only three pounds and five ounces. He was initially treated at Winter Haven Hospital’s Level II neonatal intensive care unit by a neona-tologist, Dr. Kong. She placed the child on a breathing machine to assist his underdeveloped lungs. The child responded well to the treatment and was removed from the machine on July 31. He continued to progress at the hospital. The records reflect that both parents visited the child in the hospital on a regular basis.
 

 On August 14, the child began to demonstrate a distended abdomen, which can be a symptom of necrotizing enterocolitis, a gastrointestinal condition that, although rare, is more common among premature children. This condition is an infection in the bowels. The infection can eventually kill intestinal tissue, which in turn can result in a blood-borne infection. Such a blood-borne infection can quickly overwhelm a small child and can be fatal. If antibiotics are ineffective against this condition, apparently surgery is the only option available to remove the dead intestinal tissue that is causing the infection.
 

 X-rays taken on August 14 suggested that the infection might already be advanc
 
 *923
 
 ing rapidly. Dr. Kong concluded that the child needed a pediatric surgical consultation because she was not qualified to determine whether surgery was necessary. Because Winter Haven Hospital is a Level II facility, it did not have an available pediatric surgeon on staff, and Dr. Kong began looking for a Level III facility that could provide surgical treatment.
 

 Dr. Kong called TGH and talked to Dr. Monisha Saste, who is also a neonatologist. According to Dr. Kong, Dr. Saste explained to her that although TGH was a Level III facility, it did not have a pediatric surgeon on staff. She explained that TGH transferred such pediatric patients to St. Joseph’s Hospital when surgery was required and that such a transfer could occur in the case of this child.
 
 [1]
 
 Dr. Kong did not recall Dr. Saste’s exact words, but she believed that Dr. Saste was assuring her that the child would receive a surgical consult if transferred to TGH. Accordingly, the child was transferred to TGH after Dr. Kong talked to the parents and obtained their consent for the child to be transferred.
 

 The child was transported by helicopter to TGH, arriving in the early hours of August 15. The child did not immediately receive a surgical consult. In fact, the child never received a surgical consult. Dr. Saste continued to provide treatment similar to that provided by Dr. Kong. The parents spent the next three days at the adjacent Ronald McDonald House and visited the child often.
 

 Initially, at TGH the child seemed stable and perhaps even to improve with the antibiotic treatment. Then his condition deteriorated rapidly. On August 16, the child’s care was taken over by Dr. Robert M. Nelson, who was the chief of pediatrics at TGH. Sometime later that day, Dr. Nelson concluded that there was a high probability that the child needed surgery. He testified that he contacted a surgeon at St. Joseph’s Hospital and that the surgeon, without conducting a consult, told him that, more likely than not, the child would die with or without surgical intervention. The child died at TGH without surgery at 3:30 a.m. on August 17 with his parents at his side. The surgeon whom Dr. Nelson claimed he called at St. Joseph’s Hospital had no recollection of such a telephone call and testified that she would not have determined whether the child needed surgery without first examining the child. The verdict in this case suggests that the jury may have concluded that Dr. Nelson had not made this telephone call.
 

 The Personal Representative sued TGH and also sued Dr. Saste and Dr. Nelson individually. The case proceeded to trial on the Third Amended Complaint. The first count of that complaint alleged fraud in the inducement. It alleged that Dr. Saste, as an agent of TGH, knowingly and intentionally misrepresented to Dr. Kong that the child would receive a pediatric surgical consultation upon admission to TGH, that at the time of this misrepresentation Dr. Saste had no intention of obtaining this consultation, and that she made this false statement intending the parents to rely on this false statement to their detriment. As discussed later, the evidence did not support these strong accusations, and the trial court properly granted a directed verdict as to this count.
 

 The second count was a more typical claim of medical negligence. Prior to trial, by joint stipulation, Dr. Saste and Dr. Nelson were dismissed from the lawsuit as a result of a settlement. The case proceeded to trial against TGH with the Personal Representative seeking to make the
 
 *924
 
 hospital liable for any medical negligence on the part of the two physicians. As explained earlier, the jury returned a verdict on this claim in favor of the Personal Representative, awarding the parents sizable amounts as survivors. Although many issues were litigated at trial, including whether the doctors who were employees of the University of South Florida were actual or apparent agents of TGH, whether the doctors committed medical negligence, and whether the child’s death was the result of that negligence, these issues are not matters in controversy in this appeal and will not be discussed in any detail.
 

 Following the jury’s verdict, TGH filed five motions. First, it filed a motion for remittitur, seeking to enforce the limitation of liability in section 766.209(4). Second, it filed a motion for remittitur under section 768.74, Florida Statutes (2003). Third, it filed a motion for setoff due to the settlement paid on behalf of Dr. Saste and Dr. Nelson. Fourth, it sought a judgment in accordance with its prior motion for directed verdict on several issues, including an argument that the father had not established testimony to support his claim for pain and suffering. Finally, TGH filed a motion for new trial. Both parties filed extensive memoranda as to these issues.
 

 All of TGH’s motions were denied except as follows: The trial court granted the motion to limit the mother’s damages to $350,000 pursuant to section 766.209(4).
 
 [2]
 
 It granted both the motion for judgment in accordance with a prior motion for directed verdict as to the father’s claim for damages as a survivor and the motion for remittitur as to that claim, reducing the amount from $4,000,000 to $0. Thus, the trial court entered judgment in September 2008 in favor of the Personal Representative, but limited to the $350,000 awarded to the mother as survivor. The Personal Representative appealed this judgment.
 

 II. Section 766.209(4) is Constitutional.
 

 The Personal Representative, with support from an amicus, extensively argues that section 766.209(4) is unconstitutional. That statute in its entirety is attached to this opinion as Appendix A. In general, the statute provides for “effects”
 
 [3]
 
 following the refusal of a party to submit a medical negligence claim governed by chapter 766 to voluntary binding arbitration when the other side wishes to arbitrate the claim. A refusal to arbitrate essentially limits a plaintiffs noneconomic damages to $350,000.
 
 [4]
 

 The Personal Representative recognizes that this statute was declared constitutional in
 
 Echarte,
 
 618 So.2d at 198, where the primary issue was whether the statute denied access to courts under article I, section 22, of the Florida Constitution. She argues that the decision in
 
 Echarte
 
 should be reconsidered or is no longer correct for a number of reasons. We will not describe each of the Personal Representative’s arguments in detail, but several warrant discussion.
 

 
 *925
 
 The Personal Representative makes an interesting argument. To understand this issue, it is critical to understand the interplay between section 766.209 and section 766.207. Section 766.207 establishes voluntary binding arbitration of medical negligence claims. At first glance, section 766.209 appears to create sanctions for the failure of a litigant to cooperate with the other party by engaging in binding arbitration. This is not actually its effect.
 

 The damages awardable in a medical negligence arbitration proceeding under section 766.207 are even more restricted than the damages awardable under section 766.209. If the parties proceed to binding arbitration, noneconomic damages are capped at $250,000 and punitive damages are unavailable.
 
 See
 
 § 766.207(7)(b), (d). Thus, the primary benefit of voluntary arbitration is speed and efficiency. The outcome is reached quicker and cheaper. This would appear to be a valuable tool for the claimant with a small claim, but it places great limitations on a claimant who has or will endure extensive pain and suffering.
 

 Thus, in reality, the cap in section 766.209 is not merely an “effect” of refusing arbitration; it is a cap on common law damages awarded in a trial by jury that is guaranteed in article I, section 22, of the Declaration of Rights of the Florida Constitution. It is a limitation that can be created by the defendant’s willingness to arbitrate for an even lower award whenever such arbitration is in the best self-interest of the defendant. This cap is allegedly justified under the guidelines established in
 
 Kluger v. White,
 
 281 So.2d 1 (Fla.1973), to address statutes that limit access to courts. Those guidelines require the legislature to create a “reasonable alternative” to the common law right and to justify the abolishment of a common law right without the creation of a reasonable alternative with an express finding of an “overpowering public necessity.”
 
 Id.
 
 at 4. In the case of section 766.209, the legislature justified the limitation it placed on the common law by creating, as a “reasonable alternative” to jury trial, the binding arbitration in 766.207, but this “reasonable alternative” provides an even more limited remedy than the cap in section 766.209(4).
 

 Moreover, the overall collection of statutes that limited access to the courts in 1988 in medical malpractice cases was supported by legislative findings explaining that a then-existing crisis in the medical liability insurance market created an “overpowering public necessity,” as required by
 
 Kluger.
 
 The Personal Representative maintains that, when such legislative findings are essential to overcome the public’s right of access to courts, they should not last in perpetuity, and that the legislature should have some obligation to reassess conditions occasionally to confirm the continuing existence of an overpowering public necessity. The Personal Representative believes it could establish that the crisis no longer exists if a forum existed for that presentation.
 
 [5]
 

 Finally, the $350,000 limitation in this statute and the $250,000 limitation in section 766.207(7)(b) were both established in
 
 *926
 
 1988 and have never been increased.
 
 [6]
 

 See Echarte,
 
 618 So.2d at 191-92 nn. 11-13. Inflation alone has substantially increased the limitation prescribed by this statute and has substantially reduced the “reasonable alternative” essential to upholding the statute against a charge that it denies access to courts.
 
 [7]
 

 Thus, although we follow
 
 Echarte,
 
 we certify this constitutional question as a question of great public importance at the conclusion of this opinion.
 
 [8]
 

 III. The Father’s Entitlement to Damages
 

 The trial court’s orders that override the jury’s award of $4,000,000 in this case are somewhat unusual. The court granted both a postverdict directed verdict and a remittitur. The remittitur did not reduce the award; it eliminated the award. The unusual combination may have been the result of a disagreement over whether TGH had preserved the right to a directed verdict when its initial motion for directed verdict was not made at the end of the plaintiffs case. Our ruling in this case allows us to avoid discussing the procedural questions relating to the timing of the motion for directed verdict.
 

 There is no dispute that Robert Gardner did not testify. There also was no before- and-after witness to explain how the death of his namesake son affected him. This couple was not married at the time of the child’s death and the circumstances of their relationship are not well developed in the record, although Ms. Parham was described during trial as Mr. Gardner’s fian-cée.
 

 On the other hand, it was undisputed that the medical records established that Mr. Gardner visited the child regularly at both Winter Haven Hospital and TGH. He did not abandon this child. He was at the hospital when his son died. He attended the trial and was introduced to the jury.
 

 There is little question that a jury is better informed about a parent’s sorrow when the parent and other witnesses take the stand to describe the emotional loss. The issue here, however, is whether such testimony is essential to establish a prima facie claim to some award by the jury. The trial court in this case held that a father who watched his namesake son die after monitoring his care in the hospital for several weeks was not entitled to a dollar.
 

 We conclude that a prima facie claim for survivor benefits under the wrongful death statute does not necessitate a parent’s taking the stand to describe the sorrow. The evidence in this case that Mr. Gardner was the father and that he had taken an active
 
 *927
 
 interest in the life of this child during his brief stay on earth was sufficient to withstand a motion for directed verdict. The trial court, thus, erred in granting that motion.
 

 As to the motions for remittitur, consistent with our ruling in section II of this opinion, we must hold that the award to the father cannot exceed $350,000. The closer question is whether the trial court should now be given renewed discretion to award an amount less than $350,000 under section 768.74. Although an award of zero is inappropriate in this case, should the trial judge be given the option on remand to reconsider .this motion and award a larger amount, for example, $250,000? We conclude that the answer is no.
 

 First, it is not often that we give trial courts a second bite at the apple when an error was made on the first disposition of a motion. Second, this is not a case in which the trial court was relying on testimony, including its tenor and cadence, to justify a different award; we have nearly the same vantage point as the trial judge on this issue. Third, pain and suffering is inherently a difficult element to measure, and it is a difficult element to reassess under the guidelines established in section 768.74(5). If the jury in this case had reached a verdict of $350,000, rather than an amount more than ten times higher, we would be hard-pressed to state that they were awarding damages in a range that obviously exceeded the maximum limit of a reasonable range in which they were free to operate.
 
 See generally Bould v. Touchette,
 
 349 So.2d 1181, 1184-85 (Fla.1977). In opening statement, the Personal Representative suggested a verdict in the range of $15,000,000 would be appropriate for Mr. Gardner. The defense attorneys never suggested any range in which the jury should operate.
 
 [9]
 

 Finally, the jury in this case heard extensive evidence from many witnesses, and it is obvious that the jury was convinced that the death of this infant was avoidable if TGH had simply obtained the pediatric surgical consult that Dr. Kong thought was necessary when she transferred the child to TGH. The jury was free to conclude that the parents’ grief was in some part measured by the knowledge that their child had died for no reason, much less a good reason. Such decisions by juries are entitled to a level of credence and respect by the judiciary. We are not convinced that a remittitur of this $4,000,000 award to an amount below $350,000 would fulfill the Legislature’s express recognition in section 768.74(6) that “the reasonable actions of a jury are a fundamental precept of American jurisprudence and that such actions should be disturbed or modified with caution and discretion.”
 

 Accordingly, on remand, we require the trial court to enter judgment in favor of Mr. Gardner in the amount of $350,000, with appropriate interest.
 

 IV. The Personal Representative Did Not Prove Fraud.
 

 We affirm the trial court’s decision to grant a directed verdict at the close of the Personal Representative’s case on the claim for fraud in the inducement. In so doing, we emphasize that we are not holding that such a claim was appropriate in this context or that such a claim, if appropriate, would be a method to obtain a judgment in excess of the cap established in section 766.209(4). We briefly discuss these concerns but ultimately conclude that the Personal Representative did not
 
 *928
 
 establish evidence of a false statement concerning a material fact.
 

 Medical malpractice, as a legal theory, has evolved over several centuries.
 
 See generally
 
 Theodore Silver,
 
 One Hundred Years of Harmful Error: The Historical Jurisprudence of Medical Malpractice,
 
 1992 Wis. L.Rev. 1193 (1992). The relationship that establishes a duty owing to the patient is normally contractual or quasi-contractual, but every law student learns that contract law does not provide an adequate mechanism to measure damages for a physician’s malpractice resulting in a physical injury or death.
 
 See Hawkins v. McGee,
 
 84 N.H. 114, 146 A. 641 (1929) (permitting “benefit of the bargain” damages for flawed surgery). Likewise, the concept of informed consent was initially created as a defense against claims that the doctor’s malpractice had been an impermissible touching and, thus, a battery.
 
 See Stackhouse v. Emerson,
 
 611 So.2d 1365, 1367 n. 2 (Fla. 5th DCA 1993);
 
 Sistrunk v. Hoshall,
 
 530 So.2d 935 (Fla. 1st DCA 1988);
 
 Vomacka v. Hervey,
 
 382 So.2d 41 (Fla. 2d DCA 1979);
 
 Brown v. Wood,
 
 202 So.2d 125 (Fla. 2d DCA 1967). Over time, the law evolved so that our standard jury instructions now explain to the jury that the physician can commit professional negligence if he or she fails to obtain informed consent under circumstances requiring consent.
 
 See
 
 Fla. Std. Jury Instr. (Civil) 4.2(b). The standards of care applicable in most medical negligence cases are now stated in a statute.
 
 See
 
 § 766.102. The field is heavily regulated both by case law and statutory law.
 

 Having learned from experience that these cases are better resolved as matters of negligence law and not as contractual disputes or intentional torts, we are reluctant to recognize a claim of fraud in the inducement under the facts of this case. We are not holding that such tort could never be alleged, but the record in this case convinces us that such a tort should be, at least, a very rare occurrence.
 

 The elements for actionable fraud are (1) a false statement concerning a material fact; (2) knowledge by the person making the statement that the representation is false; (3) the intent by the person making the statement that the representation will induce another to act on it; and (4) reliance on the representation to the injury of the other party.
 

 Lance v. Wade,
 
 457 So.2d 1008, 1011 (Fla.1984). “In summary, there must be an intentional material misrepresentation upon which the other party relies to his detriment.”
 
 Id.; see also
 
 Fla. Std. Jury Instr. (Civil) 8.1. In the context of this case, in order to prove the final element of fraud as described in the jury instructions, i.e. loss, injury or damage, it would appear that the Personal Representative would need to prove that TGH through its agents committed malpractice.
 

 There would be no legal injury sustained as a result of the alleged misrepresentation if the medical treatment had been acceptable. Thus, if the child had successfully responded to the medical treatment as anticipated by Dr. Saste, there would be no damages in fraud even if Dr. Saste had expressly made a representation of fact that she would obtain an immediate surgical consult and then had not obtained it. If one element of this intentional tort can be proven only by establishing everything needed to prove medical malpractice under a negligence theory, we are not entirely convinced there is a justification for creating a claim for fraud in the inducement. If the only purpose of such a claim is to obtain damages in excess of the cap established in section 766.209 or to obtain punitive damages under procedures different than those normally used in a medical negligence case, these purposes seem at
 
 *929
 
 odds with the public policies announced by the legislature, and we question whether these purposes would warrant the recognition of a claim for fraud in the inducement in this context.
 

 Having expressed these concerns, our holding is much narrower. The Personal Representative needed to establish a material misrepresentation of fact by an agent of TGH. In this case, the critical conversation is the telephone call between Dr. Saste and Dr. Kong immediately before the transfer of the child from one hospital to the other. TGH has a large Level III neonatal intensive care unit, and the neo-natologist in charge of that unit undoubtedly receives many calls to transfer children from other facilities. Dr. Saste did not deny that such a telephone call had occurred, but she had no recollection of its content:
 

 Thus, if a material misrepresentation of fact were to be established in this case, the evidence needed to come from Dr. Kong. We have carefully reviewed Dr. Kong’s testimony. There is no question that she would have obtained a surgical consult as soon as the child arrived at TGH if she had been the neonatologist at TGH. From her conversation with Dr. Saste, she “felt assured” that the child would have a surgical consult. However, she admitted that Dr. Saste told her that TGH did not have a pediatric surgeon on staff. Dr. Kong never testified that Dr. Saste promised or represented to her that she would bring in a pediatric surgeon from another hospital and that the child would be given such a consult if the child were transferred to TGH.
 

 Dr. Saste testified that when the child was admitted, she examined the child and determined that continued medical management was in order and that a surgical consultation was not needed at that time in light of what she saw in her examination of the child. Throughout the duration of her shift on that first night, she believed the child was stable.
 

 Given the entirety of the evidence in this case, the jury was free to determine that Dr. Saste’s treatment and the treatment of the staff at TGH fell below the appropriate standard of care on the medical negligence claim, but we agree with the trial court that the testimony did not establish prima facie evidence that Dr. Saste made a false statement concerning a material fact. Accordingly, the trial court correctly granted a directed verdict on the claim of fraud.
 

 V. Conclusion
 

 Accordingly, we affirm the judgment for $350,000 in favor of the mother as a survivor. We reverse the orders denying an award to the father and remand for entry of a judgment for $350,000 with appropriate interest. We affirm the judgment in all other respects and certify the following question of great public importance:
 

 DOES THE $350,000 LIMITATION OR CAP ON LIABILITY FOR NONECO-NOMIC DAMAGES ESTABLISHED IN 1988 IN SECTION 766.209(4) REMAIN CONSTITUTIONAL IN 2009, EVEN THOUGH THE AMOUNT OF THIS CAP HAS NEVER BEEN ADJUSTED TO ACCOUNT FOR INFLATION AND THE LEGISLATURE HAS NEVER BEEN REQUIRED TO RECONFIRM THE CONTINUED EXISTENCE OF THE “OVERPOWERING PUBLIC NECESSITY” THAT JUSTIFIED LIMITING ACCESS TO THE COURTS IN 1988?
 

 Affirmed in part, reversed in part, and remanded.
 

 VILLANTI and LaROSE, JJ., Concur.
 

 APPENDIX A
 

 766.209. Effects of failure to offer or accept voluntary binding arbitration
 

 (1) A proceeding for voluntary binding arbitration is an alternative to jury trial and
 
 *930
 
 shall not supersede the right of any party to a jury trial.
 

 (2) If neither party requests or agrees to voluntary binding arbitration, the claim shall proceed to trial or to any available legal alternative such as offer of and demand for judgment under s. 768.79 or offer of settlement under s. 45.061.
 

 (3) If the defendant refuses a claimant’s offer of voluntary binding arbitration:
 

 (a) The claim shall proceed to trial, and the claimant, upon proving medical negligence, shall be entitled to recover damages subject to the limitations in s. 766.118, prejudgment interest, and reasonable attorney’s fees up to 25 percent of the award reduced to present value.
 

 (b) The claimant’s award at trial shall be reduced by any damages recovered by the claimant from arbitrating code-fendants following arbitration.
 

 (4) If the claimant rejects a defendant’s offer to enter voluntary binding arbitration:
 

 (a) The damages awardable at trial shall be limited to net economic damages, plus noneconomic damages not to exceed $350,000 per incident. The Legislature expressly finds that such conditional limit on noneconomic damages is warranted by the claimant’s refusal to accept arbitration, and represents an appropriate balance between the interests of all patients who ultimately pay for medical negligence losses and the interests of those patients who are injured as a result of medical negligence.
 

 (b) Net economic damages reduced to present value shall be awardable, including, but not limited to, past and future medical expenses and 80 percent of wage loss and loss of earning capacity, offset by any collateral source payments.
 

 (c)Damages for future economic losses shall be awarded to be paid by periodic payments pursuant to s. 766.202(9), and shall be offset by future collateral source payments.
 

 (5)Jury trial shall proceed in accordance with existing principles of law.
 

 [1]
 

 . After these events, TGH did hire a full-time pediatric surgeon.
 

 [2]
 

 . In this case, the parents’ damages are all noneconomic. If they had sustained other "net economic damages,” those damages would not have been subject to the cap.
 
 See
 
 § 766.209(4)(a).
 

 [3]
 

 . Section 766.209 is titled "Effects of failure to offer or accept voluntary binding arbitration."
 

 [4]
 

 .Although the statute states that this limitation is "per incident," a related statute has been interpreted to provide $250,000 per claimant per incident.
 
 See St. Mary's Hosp., Inc. v. Phillipe,
 
 769 So.2d 961 (Fla.2000). The parties agree that this statute’s $350,000 cap should be interpreted in the same fashion. Thus, the award of $350,000 for the mother in this case does not preclude a similar award to the father.
 

 [5]
 

 . Candidly, the reasoning in
 
 Echarte
 
 appears to extend the holding in
 
 Kluger
 
 in ways the court may not have intended. In
 
 Kluger,
 
 the no-fault statute eliminated causes of action that did not involve damages in excess of a certain threshold. 281 So.2d at 2. The court appears to hold that such a statute could be constitutional only if the legislature either provided a reasonable alternative form of protection or if it provided no alternative but justified the absence of an alternative on the existence of an overpowering public necessity.
 
 Id.
 
 at 4.
 
 Echarte
 
 examined both of these tests in a case where the statutes do not eliminate a cause of action, but rather limit the monetary remedies available under that cause of action.
 

 [6]
 

 . For example, and by way of comparison, this court recently reviewed a wrongful death claim against a pharmacy for professional errors that were similar to medical malpractice. The claim was not subject to the limitations in chapter 766 and even the defense attorneys believed that the jury should award a verdict many times higher than the $350,000 cap that is applicable in this case.
 
 See Walgreen Co. v. Hippely,
 
 Nos. 2D08-86, 2D08-835, 2010 WL 688227 (Fla. 2d DCA Feb. 26, 2010).
 

 [7]
 

 . The Bureau of Labor Statistics consumer price index inflation calculator, for example, calculates that the equivalent of $300,000 in 1988 was $548,596.79 in 2009.
 
 See
 
 Bureau of Labor Statistics, CPI Inflation Calculator, http://www.bls.gov/data/inflation_calculator. htm (last visited February 12, 2010).
 

 [8]
 

 . The Personal Representative also suggests that the voters have overridden the
 
 Echarte
 
 decision by the enactment of article I, section 26, of the Florida Constitution in 2004. That provision protects plaintiffs from excessive attorneys' fees by their own attorneys in medical liability claims. We are unconvinced that it expressly overrides anything in section 766.209.
 

 [9]
 

 . It perhaps should not be a factor in our decision, but we note that, as a practical matter, a remittitur less than $350,000 would entitle Mr. Gardner to seek a new trial, whereas an award of the statutory cap results in closure of this case.